AMERICAN LOCOMOTIVE CO. v. THORNTON.

(Circuit Court of Appeals, Fourth Circuit. April 1, 1919.)

No. 1671.

1. TRIAL ⬤420—DIRECTED VERDICT AT CLOSE OF PLAINTIFF'S CASE.
   Refusing a motion for a directed verdict at close of plaintiff's case is not erroneous where defendant subsequently offers evidence in its own behalf.

2. TRIAL ⬤142—DIRECTED VERDICT—EVIDENCE.
   Defendant's motion for a directed verdict at close of plaintiff's case was properly refused where reasonable men might reasonably differ as to inferences to be drawn from the evidence.

3. MASTER AND SERVANT ⬤278(5)—PERSONAL INJURY—SUFFICIENCY OF EVIDENCE.
   Evidence that a defective unguarded machine broke a tool as plaintiff employé was passing by, that part of such tool struck him in the eye,

that tools did not break if the machine was in proper condition, and that no inspection was made of the machines, etc., *held* to sustain a verdict that defendant employer was negligent.

4. **MASTER AND SERVANT** ⬤═201(3)—PERSONAL INJURY—NEGLIGENCE OF FELLOW SERVANTS.

Where plaintiff employé was not operating the machine which caused his injury, defendant employer is liable for its own negligence, although certain of its repairmen may also have been negligent and contributed to plaintiff's injury.

5. **MASTER AND SERVANT** ⬤═235(7)—PERSONAL INJURY—PLAINTIFF'S DUTY TO DISCOVER DEFECTS.

An employé may assume that his employer has provided, and is maintaining, safe machinery and appliances.

6. **MASTER AND SERVANT** ⬤═235(7)—PERSONAL INJURY—PLAINTIFF'S DUTY TO DISCOVER DEFECTS.

Plaintiff employé, who was not required to inspect or repair his employer's machinery, is not precluded from recovering for personal injuries because he failed to discover defects which were observable only after close examination.

7. **MASTER AND SERVANT** ⬤═201(3)—PERSONAL INJURY—FELLOW SERVANTS.

Plaintiff employé's recovery for personal injuries cannot be defeated because repairmen performing a nonassignable duty of defendant employer were negligent.

8. **MASTER AND SERVANT** ⬤═226(1)—PERSONAL INJURY—ASSUMPTION OF RISK.

An employé assumes only risks incident to his employment, and does not assume those caused by his employer's negligence.

9. **MASTER AND SERVANT** ⬤═293(2)—PERSONAL INJURY—INSTRUCTIONS.

Evidence in employé's personal injury case *held* to authorize instructions that it was defendant employé's duty to exercise reasonable care in providing a safe place to work, to furnish safe appliances, competent employés, proper inspectors, and that it was charged with notice of defects it might have discovered with ordinary care.

10. **MASTER AND SERVANT** ⬤═293(11)—PERSONAL INJURY—INSTRUCTIONS.

In a servant's personal injury action, an instruction respecting the care required of defendant employer in protecting its machines, etc., *held* proper.

11. **MASTER AND SERVANT** ⬤═289(23)—PERSONAL INJURY—INSTRUCTIONS.

In a servant's personal injury action, an instruction that plaintiff could recover if machine which caused a tool to break was in bad condition through defendant's negligence, and if it was not plaintiff's duty to inspect or repair machine, and if he did not know of its defects until he was passing it, etc., *held* proper under the facts.

12. **MASTER AND SERVANT** ⬤═295(9)—PERSONAL INJURY—INSTRUCTIONS.

In a servant's personal injury action, instruction that an employé does not assume risk of an unsafe place while reasonably relying upon his employer's promise to remedy conditions *held* supported by the evidence.

13. **MASTER AND SERVANT** ⬤═294(8)—PERSONAL INJURIES—INSTRUCTIONS.

In servant's action for personal injuries, an instruction that an employer, failing to perform a personal and nonassignable duty, was liable although a fellow servant's negligence also contributed to the injury, *held* proper.

14. **TRIAL** ⬤═191(10)—INSTRUCTIONS.

In a servant's personal injury action, a requested instruction assuming that a fellow servant's negligence was sole cause of injury is properly refused, where evidence indicated that defendant employer's failure to inspect and repair a machine contributed to injury.

15. **TRIAL** ⬤═252(11)—PERSONAL INJURY—INSTRUCTIONS.

In a servant's personal injury action, a requested instruction based upon theory that it was plaintiff's duty to supervise the inspection of

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

machine which caused his injury was properly refused where evidence showed fact to be otherwise.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Action by Moses L. Thornton against the American Locomotive Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The instructions mentioned in the opinion are as follows:

"(1) The court instructs the jury that it was the duty of the defendant company to use and exercise reasonable and ordinary care (1) to provide and maintain a reasonably safe place for the plaintiff to do the work which he was employed by the defendant to do; and (2) to exercise a like degree of care and diligence to furnish and maintain for its employés reasonably suitable, sound and safe machines, appliances, bits, and tools such as are reasonably calculated to provide for their safety, and to this end to inspect, test, and examine the same, from time to time, for the purpose of discovering any bad order, condition, or defect in them, and to repair the same so as to keep and maintain them in reasonably safe order and condition for use by the defendant's employés; and (3) to exercise a like degree of care to employ competent and careful men and employés to do its said work of inspecting, testing, repairing, using, and operating its said machines, appliances, bits, and tools in making shells, and near to which plaintiff was employed to work; and (4) to exercise a like degree of care to see that its said inspectors and repairmen did their said work in a reasonably careful and proper manner and way, and that these duties could not be assigned or delegated by the defendant to any of its employés so as to exempt defendant from liability for damages caused by the failure to perform said duties; and if the jury believe from the evidence in this case that the defendant company failed to exercise ordinary and reasonable care in the performance of any one or all of the aforesaid duties, and that such failure was the cause of the injury to the plaintiff, without negligence on his part, then the jury will find for the plaintiff.

"(2) The court further instructs the jury that the defendant is charged with notice not only with what it knew, but also of what it ought to have known by the exercise of ordinary care, foresight, and precaution on its part to inspect, examine, and discover the condition of the machine referred to in the declaration; and if the jury believe from the evidence that the said machine was in bad order and condition before and at the time Thornton was injured, and that the said defendant knew, or could have known, of its said bad order or dangerous condition by the exercise of ordinary and reasonable care on its part, in time to have repaired the same or warned the plaintiff thereof and prevented the injury, and that it failed so to do, and that such failure was the proximate cause of the plaintiff's injury, without negligence on his part, then the defendant is liable.

"(3) The court instructs the jury that if they believe from the evidence in this case that the defendant, in the exercise of ordinary care, ought to have put a guard or shield on its machine over the tool that broke and injured Thornton, and that it was practicable so to have done to furnish reasonable and efficient protection to prevent it, in the event it broke, from being hurled against and injuring Thornton and its other employés employed and directed by the defendant to work around or near to said machine while said machine was being operated, and that defendant failed to do so, and that by reason of such failure the said tool, without negligence on Thornton's part, broke, struck and injured Thornton, while he was in the discharge of his duties and exercising ordinary care, then they should find for the plaintiff, unless they believe from the evidence that the dangerous condition which caused said tool to break was known and appreciated by Thornton, and was so great and imminent as to deter an ordinary prudent person from accepting the employment and doing the work Thornton was doing at the time he was injured.

"(4) The court instructs the jury that if they believe from the evidence that the machine upon which the tool broke and injured Thornton was before and at the time of the injury being operated by an employé of the defendant other than Thornton, and that the tool broke because the machine, through the negligence of the defendant, was in bad order and condition, and that it was not Thornton's duty to inspect and repair said machine, and that he did not know, and in the exercise of ordinary care would not have known, that it was in such bad order until he was informed thereof by the operator of said machine while he was passing the machine just about or at the time the tool broke and injured him while he was exercising ordinary care and was in the discharge of his duties as an employé of the defendant and going by or passing said machine, then he is entitled to recover. .This instruction is subject to the qualification set forth in instruction 3 given herein.

"(5) The jury are instructed that when an employé enters the service of the master he assumes all risk naturally incident to his employment, but the law does not mean by this accidents and injuries occurring from the failure of the master to use ordinary care and diligence in providing reasonably safe place and reasonably safe machinery and instruments for the use of the servant, and to use like care and diligence in providing such appliances as are reasonably calculated to provide for his safety, and the servant entering such service has the right to presume that the master has discharged his duty in this respect; and if an injury is occasioned to the servant because of the failure of the master to use ordinary care to provide reasonably safe and suitable appliances for his safety while in the discharge of his duties, and that such negligence on the part of the master, the plaintiff being himself in the exercise of proper care, was the proximate cause of the injury, the master is liable to the servant for damages, unless the plaintiff knew, or in the exercise of ordinary care ought to have known, of said defect in time to have avoided the injury.

"(6) The court instructs the jury that when an employé knows that the place in which he works is unsafe, and notifies the employer or his agent of such fact, and the employer or his agents promises to remedy such conditions, then the employé does not assume the risk of such unsafe place during the time reasonably required for the performance of the employer's promise, unless the danger is so imminent that no ordinarily prudent man would under the circumstances rely upon such promise and continue to do the work.

"(7) The court instructs the jury that if a servant was injured by the failure of the master to perform any of the personal and nonassignable duties which the law imposes upon him, as defined in instruction No. 1, such as exercising ordinary care, foresight, and precaution to provide and maintain reasonably safe machinery and appliances, etc., and such failure proximately contributed to cause the servant's injury, it is no defense for the master that the negligence of a fellow servant also contributed to or concurred in producing the injury, as in such case the master is liable as though he only was at fault."

"I-2. The court instructs the jury that if they believe from the evidence that the machine in use in this case was defective, nevertheless, if they further believe that the witness Ragland, who had been operating said machine, was told by Thornton, the plaintiff, not to operate it until it had been repaired, and that nevertheless Ragland did operate it, and that the accident and injury to the plaintiff resulted from this operation of the machine, the negligence which caused the accident was that of a fellow servant of the plaintiff, and they must find for the defendant.

"L-2. The court instructs the jury that it is their duty to try this case without being influenced by sympathy or the mere fact that the plaintiff was injured. You are under the solemn obligation of an oath to decide according to the law and the facts; and unless there is proof of negligence on the part of the defendant, and no proof of contributory negligence on the part of the plaintiff, or of negligence on the part of a fellow servant, such as to relieve the defendant of liability and as pointed out in other instructions, the plaintiff is not entitled to recover.

"M-2. The court instructs the jury that an employer may, by general rules, impose upon his employé the duty to supervise the inspection of the machin-

ery under his direction, and of seeing to it that said machinery is kept in repair; and if the jury believe from the evidence that the machine in this case was defective or in need of repair, yet if they further believe that it was the duty of the plaintiff as foreman to see to it that the operators under him kept their machines running and in condition for work, and reported breakdowns or defects to the repair force or to himself, and that they reported to him any failure of the repair force to act within a reasonable time, and that, if the plaintiff had performed his duty in this regard, he would have known of the condition of the machine in time to avoid the accident, they must find for the defendant."

Murray M. McGuire, of Richmond, Va. (McGuire, Riely, Bryan & Eggleston, of Richmond, Va., on the brief), for plaintiff in error.

M. J. Fulton and R. E. Byrd, both of Richmond, Va., for defendant in error.

Before PRITCHARD and KNAPP, Circuit Judges, and CONNOR, District Judge.

PRITCHARD, Circuit Judge. This was a civil action instituted in the United States District Court for the Eastern District of Virginia, by Moses L. Thornton (who will be referred to as the plaintiff, such being the position he occupied in the court below), to recover damages for personal injuries which it is alleged he sustained by the negligence of the American Locomotive Company, defendant below. It is alleged—

"that the defendant owned and operated a branch plant for manufacturing munitions and metal shells, and for that purpose it operated large and powerful machines, and employed thousands of hands daily; that among them it employed the plaintiff to keep the time and to see that certain of the defendant's employés, who operated certain of defendant's machines in making metal shells, kept busy at work during working hours, and to measure the length of such shells after they were taken out of the machines by the operators to see if the shells had been cut to the right length, and to sign orders for oil, etc., used by the operators in oiling its machines; that it negligently failed to provide and maintain in a reasonably safe condition and repair the machines, and especially one of them, which was then and there being operated by employés of the defendant other than the plaintiff, and that through its negligence the machine was worn out, defective, and in bad condition and repair in the following particulars:

"(a) That the rod against which the back end of the shells was pushed when put into said machine was so defective and badly constructed and so worn out that the set screw would not hold in place, and allowed the rod to slip away from the shell, and cause it to become loose and move up and down and to wabble;

"(b) And that defendant negligently allowed the clamp which went around the rear end of the said shell, when placed in the chuck of the said machine, to become worn out, loose, and defective, so that it did not hold the rear end of said shell tight, but allowed the shell to wabble and move, which it would not have done if said machine had been provided with a good and sufficient clamp;

"(c) That defendant negligently allowed said set screws or clamps on said machine to be and become loose, worn out, defective, and too short so that they did not hold such shell tight around its center;

"(d) That defendant also negligently allowed the head of said machine to become loose, and the said screws therein to become worn out, loose, and defective, so that the head of said machine in which the tool was fastened moved up and down while said machine was in operation;

"(e) That said defendant negligently allowed the clamp, which held the tools used to cut, face, and nose the shell, to become worn out, loose, and in

bad condition, repair, and too large to fit the said tool or tools, so that the said clamp or jaws did not hold the said tools tight and stationary as they should have done;

"(f) That the defendant negligently undertook to have the said tools held tight by wedging the same in the jaws of said machine, and negligently failed to furnish fit wedges to its employés operating said machine for that purpose, and the said method of wedging said tools into the jaws of said machine was a negligent, dangerous, method and means of trying to hold said tools tight in said machine;

"(g) That defendant negligently failed to provide said machine with any safeguards or shield over said tools to prevent them, in the event they broke, from flying against and injuring the plaintiff, as the defendant should have done in the exercise of ordinary care, and was required to do under the safety appliance laws and statutes of the state of Virginia;

"(h) That said defendant negligently furnished unfit and dangerous tools to said employés operating said machine in that it furnished tools with square faced edges and points which would catch or gouge in said shells and cause said tools to break;

"(i) That defendant negligently failed to provide gauges to its said employé running its said machine to enable him to set said tools true and straight in said machine.

"That said defendant also negligently failed to employ competent inspectors, and failed to inspect or cause its said machine to be inspected from time to time for the purpose of discovering and repairing defects;

"That defendant also failed to employ competent men to repair said machine and its aforesaid parts and tools;

"That defendant negligently failed to see that its repairmen carefully repaired and kept in reasonably safe condition said machine and all its parts and that the said defendant, in the exercise of ordinary care, should have known of the incompetency of its said repairmen, and their failure to repair said machine, and all of its mechanical parts and appliances and caused said machine to be and remain in such worn out, loose, bad, and defective condition, and allowed and caused one of its employés, other than the plaintiff, to operate said machine while in such condition, when said defendant knew, or ought to have known, that to operate said machine in such condition was liable to cause the aforesaid tools to break, fly, and injure the plaintiff and its other employés, and that by reason of the aforesaid negligence said defendant caused the tools or one of the tools in said machine to break, strike, and put out the right eye of the plaintiff, without negligence on his part; and that the said defendant then sent the plaintiff to one of its doctors, and had the plaintiff's said injuries treated, and by reason of the aforesaid injury the plaintiff's other eye became infected, without negligence on his part, so that he has almost lost the sight in the other eye and is now almost blind."

It was for these injuries plaintiff sued to recover damages.

The defendant in its answer avers that it is not guilty of any one of the acts of negligence alleged by the plaintiff, or any act of negligence that caused the injury; that the machine in question was supplied with "every tool, fitting, and equipment needed for its operation; and that the same were available for use at any time," and the machine, and all its tools, fittings, and equipment, complied with every requirement of the general usage of the business of such work, were in good condition, and therefore not dangerous or worn out.

That every safeguard required by the laws of Virginia had been installed on the machine and were in use at the time of the accident.

Also that the methods employed at the shop at the time of the accident, as respects the operation of the machine, were those generally used among manufacturers in the same line of business; that the defendant exercised due care in the employment of competent men to

inspect this machinery, including the particular machine in question, and did keep it in good condition, to assist operators, such as the plaintiff, in performing their duties, and that those thus employed properly performed their duties in respect to this machine, and were available before and at the time of the accident complained of, as was well known to the plaintiff; that the accident, as described in the declaration, was caused by the negligence of a fellow servant of the plaintiff; that the plaintiff was guilty of contributory negligence; that the injury complained of was caused by one of the risks assumed by the plaintiff when he undertook this employment with the defendant; that such risk was known to him, or could have been known to him, by the exercise of ordinary care, and by the exercise of such care he could have avoided any danger of injury.

The jury returned a verdict in favor of plaintiff, and judgment was entered accordingly. Defendant excepted, and the case now comes here on a writ of error.

The first assignment of error relates to the refusal of the court to direct a verdict for the defendant upon a motion made at the conclusion of the evidence introduced by plaintiff.

We think the ruling of the court as respects this point was proper:

[1] First, upon the ground that, after the court had considered the motion, defendant offered evidence on its own behalf.

In the case of Columbia & P. S. R. Co. v. Hawthorne, 144 U. S. 202, 12 Sup. Ct. 591, 36 L. Ed. 405, Justice Gray, in referring to this phase of the question, said:

"The question of the sufficiency of the evidence for the plaintiff to support his action cannot be considered by this court. It has repeatedly been decided that a request for a ruling that upon the evidence introduced the plaintiff is not entitled to recover cannot be made by the defendant, as a matter of right, unless at the close of the whole evidence; and that if the defendant, at the close of the plaintiff's evidence, and without resting his own case, requests and is refused such a ruling, the refusal cannot be assigned for error. Grand Trunk Railway Co. v. Cummings, 106 U. S. 700 [1 Sup. Ct. 493, 27 L. Ed. 266]; Accident Insurance Co. v. Crandal, 120 U. S. 527 [7 Sup. Ct. 685, 30 L. Ed. 740]; Robertson v. Perkins, 129 U. S. 233 [9 Sup. Ct. 279, 32 L. Ed. 686.]"

[2] Second, a careful examination of the evidence clearly shows that it is such that reasonable men might reasonably differ as to the inferences to be drawn therefrom; therefore it was very properly submitted to the jury for its determination; and this, in addition to what we have said, we think clearly warranted the court below in refusing to direct a verdict in favor of the defendant.

[3, 4] The second assignment of error relates to the refusal of the court to direct a verdict for the defendant made at the conclusion of all the evidence, and the fourteenth assignment of error challenges the action of the lower court in refusing to set aside the verdict of the jury as contrary to law and the evidence, and to award a new trial for the defendant.

We will consider these two assignments together in so far as they relate to the sufficiency of the evidence, and consider the other points in connection with the thirteenth.

In disposing of this point it becomes necessary to determine as to whether the court below was in error in refusing to direct a verdict for the defendant upon the ground that there was not sufficient legal evidence to show negligence on its part; in other words, that the verdict was contrary to the law and evidence.

In the case of McDermott v. Severe, 202 U. S. 600, 26 Sup. Ct. 709, 50 L. Ed. 1162, the Supreme Court said:

"Negligence only becomes a question of law to be taken from the jury when the facts are such that fair-minded men can only draw from them the inference that there was no negligence; and if, from the facts admitted or conflicting testimony, such men may honestly draw different conclusions as to the negligence charged, the question is not one of law, but of fact, to be settled by the jury under proper instructions."

In the case of Carrington v. Ficklin's Ex'rs, 32 Grat. (Va.) 670, Burks, J., speaking for the court, said:

"When the question arises upon a state of facts on which reasonable men may fairly arrive at different conclusions, the fact of negligence cannot be determined until one or the other of these conclusions has been drawn by the jury. The inferences to be drawn from the evidence must either be certain and incontrovertible, or they cannot be decided by the court. Negligence cannot be conclusively established by a state of facts upon which fair-minded men may well differ."

This is the rule established by the Virginia decisions. Blosser v. Harshberger, 21 Grat. (Va.) 214; Blair & Hoge v. Wilson, 28 Grat. (Va.) 165; Jones v. Rixey, 79 Va. 656; Southwest Implement Co. v. Smith's Adm'r, 85 Va. 306, 7 S. E. 365, 17 Am. St. Rep. 59; Creekmur v. Creekmur, 75 Va. 431; Kimball & Fink v. Friend, 95 Va. 140–144, 27 S. E. 901; Chesapeake & Ohio Ry. Co. v. Williams, 108 Va. 689, 62 S. E. 796; Thompson v. Norfolk & P. Co., 109 Va. 733, 64 S. E. 953; Va. Fire & Marine Ins. Co. v. Hogue, 105 Va. 355, 54 S. E. 8; Brugh v. Shanks, 5 Leigh, 598; Marshall's Adm'x v. Valley R. Co., 99 Va. 798, 34 S. E. 455; Danville v. Robinson, 99 Va. 488, 39 S. E. 122, 55 L. R. A. 162; Bass v. Norfolk R. Co., 100 Va. 1, 40 S. E. 100.

The question presented is as to whether plaintiff's evidence tends to show that his injury was caused by the negligence of the defendant. In other words, was the negligence of defendant the proximate cause of such injury?

It is insisted by counsel for plaintiff (a) that the machine was defective; (b) that this fact was unknown to him, but was known or should have been known to the defendant; (c) that the machine should have been repaired or guarded by the defendant in the exercise of due care; (d) that the accident was due to the defendant's negligence.

The jury, after a thorough consideration of all the facts under instructions from the court, found in favor of the plaintiff.

Bearing on this point, witness Wilborn, who had operated this machine for several weeks anterior to the accident, and up to and within an hour of the time that plaintiff was injured, testified as follows:

That "he could not keep the shells tight in the machine. The men pulled the rods down to tighten the machine, but when it started up it would stop again and it would break the tools. The two top set screws were slick and

worn out and would not hold the shells. He thought that on that morning the slide in front of the machine was loose. The set screw which holds it tight down on the slide was loose, and allowed the piece to rise up. This was loose when he left at twelve o'clock on the day when Thornton was hurt. There was something wrong with the set screws which held it tight in the slide; that caused the whole head to be loose and to rise up that held the tools. They had wedges in the tool that morning and in it all the time. The head which held the tools would rise up, and the whole head was loose that morning. He had wedged in that tool that morning and in it all the time he used wedges to hold the tool tight. The little shaft in the back of the machine would slip and not hold the rod in place. They would put the shell in and it would not hold the rod.

"Q. The set screw there was worn? A. The set screw there was worn, or else it would not have slipped; I do not know.

"Q. Let me ask you this: When you put the shell in there and that rod slipped, what effect would it have? A. Of course the shell would not have anything to hold it.

"Q. When the knuckles of this clutch were loose, what effect did that have on holding the shell tight? A. It had all; that was the main part. That would cause the shell to wabble and break the tool.

"Q. I want you to tell the jury how long the machine had been in that condition. A. I could not tell you how long. Some days it would run and again start and break the tool, and we would look out to see about it. I would ask the machinist to come and look after it.

"The machinist's name was Wilson, and witness had reported to him that morning that the machine was giving trouble and asked him to fix it. Wilson came up to the machine, and said he had no set screws to put in it, and he would get some as soon as he could. This was on the morning of the accident, and before Thornton was hurt. * * *

"Sometimes witness tried to fix it himself, and sometimes he would have to get the machinist, and sometimes the latter told him it was his own fault, that he did not have the tools in right. Sometimes they were bent, he said; sometimes they would get loose and break the tools. Shells can't be made if the tools are not right, and the repair man would say the trouble was in the tool and never said anything else was wrong. The last time the repair man told him this may have been that day. He did so several times, and if witness could not make it work he would go after machinist again. It was that same morning, a little while after the men went to work, that Wilson said he had no set screws to put in. The shaft (rod) in the back would slip, and witness reckons the set screws was loose."

"The operator would get tools from the toolroom which were not uniform as to length. Some were short and some were long. Sometimes one would bend and break; sometimes one good and one bad, and sometimes chip the corner off. The operator of the machine would go and get the tools. At that time the company would furnish the tools. It was hard to hold a short tool in the machine tight. The short tool would only go through the head of the machine to the center and would strip the threads of the studs. The tool would not break if it was a good one, properly set, and in good order and the shell held tight. Sometimes it would be loose. If machine was in bad order, and shell loose, or a bad tool, that would cause tool to break."

The plaintiff also introduced the witness Anderson, who, among other things, testified:

"That his machine was next to the one on which the plaintiff was hurt. They were a yard or a yard and a half apart. * * * That immediately after the injury to Thornton * * * that Mr. Peaco, the general foreman of that department, came and asked Anderson if he saw the accident, and Anderson told him that he did, and that Mr. Peaco then told him, 'The doctor wants to see you in the office; take the tool out of the machine and take it with you;' and that Anderson carried some of the pieces into the office and told the doctor how the accident occurred."

We think it significant that the doctor who attended him was not called for the purpose of contradicting this statement.

In the same connection the witness testified:

"That he took the tools out of the machine, and that there was a piece of inch steel under the tool on the front side, and on the back there was a piece about as wide as witness' finger. * * *

"That when he examined the machine he found the screws on the end worked under the headblock loose and also the clutch. They had worn until you couldn't pull it up against the shell, but I do not care how tight you pull it when they get worn it will work loose, and that is what caused the back of the shell to run up. That he found wedges put in between the jaws of the headblock and the tool. The wedges were little pieces of sheet iron; the head, being loose, would cause the tool to slip and cut out into the shell."

He also testified:

"Two or three different parts of that machine were wrong. The clamps that came down on the shell and the set screws at the top were battered up. There was a wedge beside the headblock in the jaw, one on the side and one on top and at the bottom, and the operator had put one in the side to hold tool so as to come out straight with the other."

It clearly appears that the machine which caused the injury to the plaintiff was being operated by one of the employés, and the fact that Thornton had nothing to do with the operation of same is shown by this witness, who said that he was present and witnessed the accident, his testimony being as follows:

"Mr. Thornton came down the line, and when he got against this man (meaning the operator of the machine) said something to him. I did not understand what it was, and Mr. Thornton turned his head towards the machine, and then he turned and started down towards the line, and about that time the belt or something, * * * and he looked back, * * * and the tool on the machine broke and struck him in the eye, and the man operating the machine it struck him in the face, and he started down the runway."

"That there was no guard over the tool on the far side at the time * * * or hood to protect it from flying in the event it broke. A shield was put on afterwards."

Plaintiff also introduced John H. Cousins, who, among other things, said:

"That he was working for the company on a machine next to the one on which Thornton was hurt, and was facing the machine and saw the accident to Thornton. The man operating the machine said something to Thornton which witness could not hear. Thornton spoke to the man and pointed towards the machinist. Thornton started down the runway towards the drillers, and the machine made a creaking noise, and Thornton looked back to see what was going on, and the tool broke and a piece must have struck him. When Thornton came up and started to pass the machine it was running and there was a shell in it. He was there only a few seconds before he was hurt. He was a yard or a yard and a half away from the machine at the time it struck him in the eye."

"He stopped to talk to a man, and Mr. Anderson was operating the machine on the other side of this machine. Mr. Wilborn had been trying to operate this machine all the morning. * * *

"At the time of the accident the shell must have been loose and the tool on the far side gave way. It was a tool which cut the shell. The shell slipped and that caused the tool to give way. * * * After the accident a man put in new set screws and new studs, either that evening or the next day. The set screws were worn up to the shoulder, and you could not make

them any tighter; they would not on this machine.  Mr. Wilborn had been trying to operate it and it would not come down on the shell.  Q. Witness does not think the studs were strong enough—that is, the down on the tool? A. Yes, sir.

"The set screws were worn out up to the shoulder.  Can't say how long they had been worn; wearing a little every day."

The witness Dodson, who did not see the accident, was introduced by plaintiff, and, among other things, responded to questions that were propounded to him as follows:

"Q. What would cause the tool to break in the machine?  A. We had set screws working on the front of the shell and the clamp in the middle and the nose end, and when one got loose it would loosen all the others and it would break the tool.  If all the parts of the machine were in good order and the machine in good shape they did not break the tools."

He also testified:

"That if the machine was in good condition and set screws and clamp tight, and he took too big a cut, it would loosen the tool but not break it. * * * It would loosen the set screws and the clamp, but could not break the tool if the machine was in good condition."

It is insisted by counsel for plaintiff that, in addition to the testimony above quoted, such testimony as respects the failure of the company to inspect this particular machine so as to discover and repair defects therein, or to furnish an inspector for that purpose, is corroborated by much of the testimony offered by the defendant.

The witness Peaco, on behalf of defendant, in testifying, among other things, in reply to questions asked him on cross-examination, said:

"Q. You told the jury on Saturday that that was his (plaintiff's) duty?  A. Yes. sir.

"Q. But it was not his duty to go and examine the parts of the machine? A. Of course not.  It was no one's duty to examine the parts of the machine.

"Q. You had no one down there to do that?  A. No, sir; we haven't any one to examine all parts of the machines."

This witness refers to the defects which caused the injury and of which it appears the defendant had actual notice.  This evidence was very material to one of the issues involved; that is, as to whether the defendant had negligently failed to provide the machine in question with safeguards "or shields over said tools to prevent them, in the event they broke, from flying against and injuring the plaintiff, as the said defendant should have done in the exercise of ordinary care, and was required to do under the safety appliance laws and statutes of the state of Virginia," as alleged in the declaration.

C. W. Glaze, who was also introduced by plaintiff, testified:

"* * * That he was not sure whether there was any guard on the machine at the time the plaintiff was hurt.  Guards were put on afterwards to prevent the tool from flying when it broke, and some of the operators left them on the machine."

This evidence was corroborated by Peaco, who, as we have stated, was introduced by defendant, who testified that—

"There was no guard over the knife and no guard had been put on those machines for the knives.  Since that time there may have been one or two,

but up to the time of the accident and after that for quite a while there were no guards on them at all."

E. C. Wilson, who occupied the position of repairman and machinist, was introduced by defendant, and among other things testified:

"That he saw guards put on several machines, fitted over said screws on the top, and extended over the tools. Supposes the guards were meant to prevent the tool from flying when breaking, but he cannot say positively, as this did not come under him, could not state the size of the guards. There were no guards on before the accident."

Kirkman, another repairman employed by defendant, testified as follows as respects this question:

"Kirkman and Jones made these shields and put them on the heads of the machines after Thornton was hurt. Jones made the suggestion that this be done, so that when the tool broke up it would not fly."

C. W. Nicholas, another witness for defendant, testified:

"* * * That there were no guards over the tool when Thornton was hurt. They were put on afterwards."

The witness Jones, who was a member of the defendant's safety committee, also testified, among other things, as follows:

"That he did not know there was a plate on the machine marked, 'Stop this machine before repairing, oiling, wiping, or adjusting work and when through for day. Guards must not be removed under penalty of law.' He did not know that guards came with the machine to go over the tool, and that they were not put on because it took more time to put shells in and out and to fit the tools with the guard on. Witness made these guards to go over the tools for all sixteen of the machines. * * * It had been witness' practice ever since he was around a machine shop to put up little pieces of sheet iron to keep chips from flying, and this was his own suggestion. Witness thought probably if tool broke it would keep it from flying off through that part of the shop. * * * It would hit that little piece of sheet iron up there and come down. * * * Witness put them on because he thought it was the proper thing to put there to keep the tool from flying if it broke."

M. F. Pollard, another witness for defendant, testified that he did not know that the statutes of Virginia required guards or shields to be used over tools on shapers and planers and this kind of machine, and that the defendant "did not use guards over the tools on shapers, planers, and other like machines, and that the tool on this machine was similar to those used on lathes."

In referring to what occurred when the tool broke on the planer he said:

"That if tool broke on planer it would have a tendency to fly just the same as if a tool broke on this machine."

Mechanical Superintendent Julius Kindervater, witness for defendant, in referring to a machine of this character, said:

"That on a machine of this kind the work revolves and the tool is stationary in cutting. If the tool were to break, the particles would be liable to fly whether it be a lathe, planer, or shaper, and if the tool on this particular machine were to break the particles would fly in any direction—you can't tell where it is going. The danger from the breaking and flying from tools is the same as on a lathe or planer, and on any cutting machine they are apt to fly, but do not always do so. Witness has seen them nip off and drop

down, and has seen them fly upwards, sideways, and in any direction, and the danger from the breaking of tool on a lathe, shaper, or planer is substantially the same as on this machine, and the conditions are substantially the same on all of these cutting tools so far as the danger from broken tools is concerned."

This is a very accurate and intelligent statement as to the danger of breaking a tool on a lathe; and he further makes it clear that a shaper or planer is subject to the same conditions, and that such machines are liable, on account of broken tools, to injure those employed in and about them while in operation.

This machine was exhibited at the time the case was argued, and from an examination of the same it appears that it is very important to keep it in a workable condition by having the screws, etc., in perfect condition.

Witness Pollard, in referring to this question, said:

"That these rods were put in by the manufacturers with the intention of stopping the shells, but the company did not use them for that purpose at all."

It clearly appears that the screws were out of order and would not hold the shells in their proper place when being operated.

The testimony on this point is corroborated by witness Wilborn, who testified on behalf of defendant. He had operated the machine in question until 12 o'clock on the day on which the injury was sustained, and in referring to its condition said:

"That he could not keep the shells tight in this machine because the two top set screws were slick and worn out and would not hold the shells; the slide in front of the machine was loose * * * and allowed the piece to rise up. There was something wrong with the set screws which held it tight. They had wedges in the tool that morning and in it all the time. The little shaft in the back of the machine would slip and not hold the rod in place. The set screw there was worn or else it would not have slipped, and that when you put the shell in there, and that rod slipped, the shell would not have anything to hold it; and that he notified Wilson, the machinist, that morning, and that Wilson had come up to the machine and said he had no set screws to put in it, and told witness to make out with it and he would get some as soon as he could. This was on the morning of the day Thornton was hurt."

It should be borne in mind that Thornton at the time of his injury was not operating this machine. It appears that he was about a yard or a yard and a half away, passing in front of the machine, when the tool which injured him, owing to its defective condition, broke, and the flying piece struck him in the eye. A number of witnesses testified that the tool never broke when the machine was kept in proper condition.

Witness Wilson, who, as we have said, testified for the defendant, in referring to what might or might not have happened in the operation of the machine, said:

"The tools would sometimes break from gouging the shell. If they were set properly, and if they made too big or deep a cut, they should not break if the chuck was tight and true. The tool would not break if set tight, and if set loose it would move back. * * * When the tool broke it was invariably because of a loose shell, but there may be other causes, and the witness could not say what they are."

It appearing that Thornton was not operating the machine and had no hand in the management of the same, and it further appearing that the injury sustained by Thornton was due in a large measure to the negligence of the company in its failure to provide a machine that was in workable condition, the defendant is liable, notwithstanding the fact that Ragland, Wilson, and Kirkman, who, as we have said, were repairmen, may have been negligent in a measure and contributed thus to the injury.

In the case of Grand Trunk Railroad Co. v. Cummings, 106 U. S. 700, 1 Sup. Ct. 493, 27 L. Ed. 266, the Supreme Court said:

"If the negligence of the company * * * had a share in producing the injury" of the deceased, "the company was liable" notwithstanding "the negligence of a fellow servant" contributed to the happening of the accident.

Also in the fourth syllabus of the case of Deserant v. Cerillos Coal Railroad Co., 178 U. S. 409, 20 Sup. Ct. 967, 44 L. Ed. 1127, is the following language:

"It is the master's duty to furnish safe appliances and safe working places, and, if the neglect of this duty concurs with that of the negligence of a fellow servant, the master is liable."

These cases are very much in point, and clearly sustain the court below in refusing to set aside the verdict of the jury upon the ground that it was contrary to the weight of the evidence.

[5-8] It is further insisted by counsel for defendant that, notwithstanding the fact that defendant was guilty of negligence, plaintiff is not entitled to recover, because (a) it was his duty to have discovered the defects in the machine, and he failed to do so; (b) that the injury resulted from the negligence of Ragland, Kirkman, and Wilson, all of whom were fellow servants of Thornton.

In view of the facts of this case, these contentions are untenable.

The plaintiff had a right to assume that defendant had provided and was maintaining safe machinery and appliances. As we have said, it clearly appears that it was not the duty of the plaintiff to inspect and ascertain the condition of the machinery, nor was it his duty to repair any defects that might exist. There is nothing surrounding the transaction to show that the duties he performed were such as to give him anything like an accurate knowledge as to the actual condition of the machine at the time he was injured.

As we have stated, Peaco, a witness for defendant, testified:

"It was no part of Thornton's duty to set tools. * * * It was not Thornton's duty to repair machines or tools."

Witness Wilson also testified that he had seen plaintiff set tools, but had "told him that the tool setter was there, and it was none of his (Thornton's) business, and said to him, 'Why don't you call him to set tools?'"

The following question propounded by the court, and the response thereto, clearly show that neither plaintiff nor any one else except the safety committee was required to inspect machines.

The Court: "Did they have an inspector there for that?"

Witness: "No, sir; no inspector but the safety committee; that is the only one."

C. A. Smith, witness for defendant, testified that he was employed by the company while plaintiff was there, and was acting as "foreman of the drill pressers, which were looked after by himself and plaintiff; * * * that after the accident he took Thornton's place on both jobs; that he was required to act in the capacity in which plaintiff had theretofore acted, and that his duties were identical with those that had been required to be performed by plaintiff." In describing the extent and character of his duties, he said:

"If he (witness) knew a machine was broken down, it was his duty to tag it, but he would only know this if the operator reported it. It was not witness' duty to inspect the machine, but if one was reported by the operator to be broken down witness would report to the repairman."

The testimony of this witness corroborates that of plaintiff respecting this matter.

Wilborn, witness for plaintiff, also testified as follows:

"The machinist's name was Wilson, and witness had reported to him that morning that the machine was giving trouble and asked him to fix it. Wilson came up to the machine and said he had no set screws to put in it, and told witness to make out with it, and he would get some as soon as he could. This was on the morning of the accident and before Thornton was hurt."

"When a machine was out of order, the system or way the company let the operator know it was out of order was the machinist put a card on it to show it was not to be used. This was done by machinist, and witness had seen the machinist put the card on. If the machine had no card on it, it was supposed to be in running order. Q. If there was not any card on the machine, what did you understand with reference to the use of it? A. We went ahead and started it up."

We think it is clearly established that it was not plaintiff's duty to repair machines of this character.

Witness Anderson, testifying on behalf of plaintiff, said:

"No one but the repairmen were allowed to do repair work on the machines. It was against the rules. If anything got wrong the men had to go and report to Mr. Wilson. They could not tighten up the screw. It was against the company's orders, and the set screw which goes through the rear of the machine to hold the rod in place had battered up around the rod so that every time you put the shell in it, it would go back two or three inches. The operators worked on it for a long time, Mr. Wilson fixed it, and the only way he did it was to cut the whole thing out and put in a new set screw."

It appears that immediately after the accident Anderson, under the direction of Peaco, took the broken tool out of the machine, both of whom testified they had not observed the same, inasmuch as they had not examined the machine.

If those whose duty it was failed to discover such defects, it is unreasonable to insist that plaintiff had knowledge of the same, upon the theory that such defective parts were so open and obvious that plaintiff could have observed such defect. As we have stated, the machine was exhibited at the time of the argument, and inspection showed that some of the defects of which complaint is made were such as not to be observable upon a casual glance, but some of them could only

be discovered by close examination, and this is especially true as to the set screws required to hold the machinery in a stable condition.

It further appears from the testimony of Wilborn that the condition of the machine had not been reported to plaintiff and that in the absence of such knowledge the plaintiff, finding no card placed thereon, instructed Ragland to operate the same at 12 o'clock on the day on which the accident occurred.

We think it is perfectly clear that this accident would not have happened had it not been for the failure of the defendant company to inspect and keep in repair the various parts of the machine in question.

The contention that Wilson and Kirkman were fellow servants of the plaintiff is unsound, because it clearly appears that they were repairmen, and as such were performing one of the nonassignable duties of defendant, and that their failure to properly inspect and repair the machine was the negligence of the company.

The rule is clearly stated in the case of Northern Pacific Railroad v. Peterson, 162 U. S. 346, at page 353, 16 Sup. Ct. 843, 845 (40 L. Ed. 994), where it is said:

"The general rule is that those entering into the service of a common master becomes thereby engaged in a common service and are fellow servants, and prima facie the common master is not liable for the negligence of one of his servants which has resulted in an injury to a fellow servant. There are, however, some duties which a master owes, as such, to a servant entering his employment. He owes the duty to provide such servant with a reasonably safe place to work in, having reference to the character of the employment in which the servant is engaged. He also owes the duty of providing reasonably safe tools, appliances, and machinery for the accomplishment of the work necessary to be done. He must exercise proper diligence in the employment of reasonably safe and competent men to perform their respective duties and it has been held in many states that the master owes the further duty of adopting and promulgating safe and proper rules for the conduct of his business, including the government of the machinery and the running of trains on a railroad track. If the master be neglectful in any of these matters, it is a neglect of a duty which he personally owes to his employés, and if the employé suffer damage on account thereof the master is liable. If, instead of personally performing these obligations, the master engages another to do them for him, he is liable for the neglect of that other, which, in such case, is not the neglect of a fellow servant, no matter what his position as to other matters, but it is the neglect of the master to do those things which it is the duty of the master to perform as such."

See Northern Pacific R. R. Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, 29 L. Ed. 755; Northern Pacific R. R. Co. v. Charless, 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999; New England R. Co. v. Conroy, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181; Martin v. Atchison, etc., R. Co., 166 U. S. 399, 17 Sup. Ct. 603, 41 L. Ed. 1051.

As we have stated there was evidence tending to show that the company had not employed an inspector. This was a circumstance which the jury undoubtedly had a right to take into account in passing upon the question as to whether the defendant was negligent.

The contention that it was the duty of Wilson to repair this machine is borne out by the fact that he had been notified of its condition by the witness Wilborn on the morning of the accident. If he had performed this duty by making proper inspection and placing a card

thereon, plaintiff would not have sustained the injury of which he complains.

However, it is insisted by defendant's counsel that plaintiff was negligent in not wearing goggles. The witness Jones testified that "foremen didn't generally wear goggles because they were not doing the work, but superintending it."

In view of the evidence, we are of opinion that the doctrine of assumed risk does not apply to the case at bar, inasmuch as it clearly appears that the defects that caused the accident were latent, and could not have been discovered without a thorough examination of such defects, and that these defects were due to the negligence of the defendant in not inspecting and keeping the machine in proper repair. It has been repeatedly held that an employé only assumes such risks as are incident to his employment, and that he does not assume risks occasioned by the negligence of defendant. This rule is too well established to require citation of authority.

[9] The defendant insists that the court below erred in granting instructions 1 and 2 in favor of plaintiff. The same objection applies to both these instructions.

In view of the evidence, a large portion of which we have quoted, we feel the court was warranted in granting these instructions.

[10] We are of opinion that defendant's contention as to instruction 3 is not well grounded, and that the rule announced by the court as to the degree of diligence required of defendant was proper in view of the evidence offered as to this phase of the case.

[11] In considering instruction 4, it should be borne in mind that it appears that it was not the duty of Wilborn to inspect this machine; that he was an operator, and had not been notified that the machine was not in workable condition. It further appears that the moment he ascertained its condition he reported to Wilson, who, as we have stated, was charged with the duty of making a proper repair of the same. When it was reported to him it appears that he examined the same; but instead of instructing Wilborn to cease operations until it could be properly repaired, he contented himself by saying to Wilborn that he had no set screws and that he must make out with it until he could secure them and make the proper and necessary repairs. This duty being nonassignable, defendant cannot relieve itself of liability by claiming it was the duty of an operator to inspect the machine, it being a duty which defendant owed the employés to employ competent persons for this character of work. It clearly appears that the operators were not qualified to make the inspection, and they certainly were not permitted to do so, for reasons that are obvious; and it further appears that Wilson, who was charged with the duty of repairing machines, told Wilborn to proceed to operate it. Under these circumstances, the negligence of Wilson, he being a vice principal, was the negligence of the company. The instruction is clear and comprehensive, and plainly states the law bearing upon the facts as established in the court below, and we think was eminently proper.

The objection to instruction 5 is of the same import as No. 3, and, as we have said, there being sufficient evidence upon which to predi-

cate instruction 3 as to the guards or shields, such is equally true of No. 5.

[12] It is insisted there is no evidence upon which to base instruction 6, "and that it has no bearing on the case, and that it is misleading, even though it be a correct statement of the law in a proper case."

This instruction is predicated upon the testimony of the plaintiff, who, among other things, said that—

" * * * Four or five days or a week before the accident men had complained to him that Mr. Wilson was not doing his work properly and was incompetent, and that he had reported it to Mr. Peaco, who told him to report to Mr. Richardson and tell the latter that Peaco said to repair the machines and get them going. Plaintiff did this, and Richardson seemed to be fretted, and said he had no man to put on the job. 'You go ahead and attend to your work and I will attend to mine. I will have them repaired for you, and I go back to my duty and keep the men at work."

Thus it appears that Richardson, machinist and foreman, when informed as to the dangerous condition of the machine, contented himself by simply inviting plaintiff to go ahead and continue in the performance of his duties around and about these machines, and that he would have them repaired, instructing plaintiff to "keep the men at work at them." The evidence indicates that Wilson on that occasion was wholly unmindful of his duty, and that he was not actuated by a desire to protect those engaged in this hazardous undertaking, and one can imagine under these peculiar circumstances the helpless condition of the plaintiff, whose livelihood depended upon his employment, and who knew if he refused to work he would in all probability be promptly discharged.

In view of the conduct of Richardson, who commanded the employé to go ahead with the work, instead of making the necessary repairs, as it was his duty to do, thereby leaving the machine in an unsafe condition, it would be manifestly unfair to exonerate defendant by holding that plaintiff was injured by his own negligence and that he assumed the risk incident to his employment.

[13] We will content ourselves by saying that in our opinion defendant's contention as to instruction 7 is without merit.

It is insisted that the court below erred in not granting the instruction I-2. This instruction is based upon the theory that Ragland was a fellow servant of the plaintiff. Having already disposed of this question adversely to the contention of defendant, we do not deem it necessary to enter into any further discussion of the same than to say that we think the action of the court in refusing to grant this request was eminently proper.

[14] We will now consider Instruction L-2, which the court below refused to grant.

This instruction is based upon the theory that Ragland's negligence was the sole and proximate cause of the injury. The evidence clearly shows that the proximate cause of the injury was not due to the negligence of Ragland. On the other hand, it clearly appears that the injury of plaintiff was due to the failure of defendant to use ordinary prudence in properly inspecting and repairing the machine which Ragland was operating under the direction of his superior. It must be

admitted that, if the machine had not been in a defective condition, plaintiff would not have sustained the injury of which he complains. We think the court very properly refused to grant this instruction.

[15] It is insisted by counsel for defendant that the court erred in refusing to grant instruction M-2. This instruction is based upon the theory that "it was the plaintiff's duty to supervise the inspection of the machinery," which we think is an erroneous assumption, inasmuch as there is a total absence of evidence to sustain such contention. On the other hand, it appears that the operators were not required to repair machines, and were not even permitted to engage in this kind of work, as we have said; and, even if it had been so required, no tools or necessary materials were furnished them for that purpose; therefore we can conceive of no theory in the light of the evidence to warrant the court below in granting an instruction of this kind.

We have carefully considered the cases relied upon by the defendant to sustain its contention, but an examination of the same show that the facts upon which they were decided are not analogous to the case at bar, and that the rule invoked by the defendant does not apply in the instant case. Here we have numerous facts and circumstances which, considered as a whole, clearly show that the employment of the plaintiff was rendered exceedingly hazardous, not on account of any fault of his, but primarily due to the failure of defendant to use ordinary prudence in inspecting and keeping in proper repair the machine in question. The defendant, having failed to perform its duty in this respect, was negligent, and it cannot relieve itself by attempting to place the blame on a fellow workman who was operating unsafe and defective machinery, the condition of which was occasioned by its own negligence, in order to defeat the right of plaintiff to recover damages for injury he sustained.

Therefore we are impelled to the conclusion that the rulings of the lower court are proper, and the judgment should be affirmed.